**Dean E. MORLOCK, et al., Petitioners, Appellants,**

v.

**ST. PAUL GUARDIAN INSURANCE COMPANY, Respondent.**

No. C2–01–340.

Supreme Court of Minnesota.

Aug. 29, 2002.

Krass & Monroe, P.A., Phillip R. Krass, C. John Jossart, Minneapolis, MN, for Appellant.

Bassford, Lockhart, Truesdell & Briggs, Michael A. Klutho, Charles E. Lundberg, Minneapolis, MN, for Respondent.

Meagher & Geer, P.L.L.P., William M. Hart, Minneapolis, MN, for Amicus Curiae—Minnesota Defense Lawyers Association.

## OPINION

GILBERT, Justice.

This case involves whether or not the district court erred in giving an aggravation of a preexisting condition instruction based on CIVJIG 91.40 and, if so, whether a new trial is warranted. Appellants Dean E. Morlock and Judy A. Morlock brought suit against respondent St. Paul Guardian Insurance Company after Dean Morlock was injured in an automobile accident, seeking to recover underinsured motorist benefits for Dean Morlock's injuries and for Judy Morlock's loss of consortium. At the end of trial, and over respondent's objections, the district court instructed the jury on aggravation of a preexisting condition based on CIVJIG 91.40. The jury returned a special verdict awarding $508,060.50 in damages to Dean Morlock and $125,000 for loss of consortium to Judy Morlock. Respondent moved for judgment notwithstanding the verdict, a new trial, or, in the alternative, remittitur of the damages award. This motion was denied and respondent appealed, arguing that the district court erred in giving a prejudicial jury instruction based on CIVJIG 91.40 and in declining to grant remittitur. The court of appeals reversed and remanded for a new trial. We reverse.

On September 15, 1996, an underinsured motorist rear-ended a car driven by appellant Dean Morlock (Morlock). Appellants sued respondent seeking to recover underinsured motorist benefits for severe and permanent back and neck injuries alleged to be the result of this accident. Morlock conceded that he had some intermittent

back strains through the years after injuring his back in 1957; however, he argued that he had fully recovered and had been free of any symptoms prior to the accident.

According to Morlock's own testimony, the accident caused, among others, the following consequences: (1) he is only able to sleep for 2 or 2 1/2 hours every night, (2) he is unable to pick up his grandson, (3) he is unable to walk up and down from his home to the lakeshore, (4) he is unable to do maintenance or chores around his house, (5) he is unable to go into his son's swimming pool, (6) he is unable to work as effectively at his job as a real estate agent, and (7) he can no longer serve as a condemnation commissioner or real estate teacher because of the sitting and standing required for these activities. He testified that all of these consequences were the result of his injuries from the accident rather than any of his preexisting conditions. Judy Morlock did not testify.

Appellants presented several other witnesses at trial. Darlene Schuman, Morlock's sister-in-law, testified that before the accident Morlock was an active man who "was able to do anything that needed to be done at [appellants'] house," which included cleaning the garage, loading suitcases when traveling, and doing yard work. She also testified that Morlock was able to bowl, golf, and dance before the accident. She then testified that as a result of the accident Morlock cannot do the things that he used to be able to do and instead has to walk with two canes.

Frank Schuman, Morlock's brother-in-law, testified that during a hunting trip with Morlock around 1990, he witnessed Morlock dragging an 8-point mule deer, that dressed out at 205 pounds, back to camp by himself. He further testified that Morlock was always in good athletic condition before the accident and that Morlock had absolutely no problem with walking and turning when he hunted with him. Schuman testified that, prior to the accident, he had witnessed Morlock use a "monstrous chainsaw" that was "more than what [Schuman cared] to lift and carry, let alone use, but [Morlock] was very capable of using that to cut large trees."

Several other witnesses also testified about how Morlock's physical capabilities changed as a result of the accident. Morlock's son, who worked with Morlock, testified that before the accident his dad was "always real active." He stated that before the accident he had hunted deer with his dad every year in Roseau and that, as a result of the accident, Morlock had to get a special permit allowing him to hunt from his car on some land just west of Prior Lake. Morlock's son testified that Morlock can no longer bowl and has to use a golf cart to get from his house to the lakeshore. Morlock's daughter also testified, stating that Morlock has to use a golf cart to go down to the lakeshore and that he is unable to lift his grandson. She stated, "the things that he used to be able to do on his own, he needs assistance with now."

Two of Morlock's coworkers also testified. One coworker testified that as a result of the accident Morlock has difficulty getting in and out of cars and that it appears to be painful for him to do so. She testified that since the accident she has never seen Morlock walking without the assistance of two canes. Another coworker stated that he had witnessed "a middle aged man grow old in a hurry." He further testified that Morlock is slow at getting in and out of cars and sales meetings appear to be extremely uncomfortable for him.

Testimony from videotaped depositions of two medical experts was introduced in support of appellants' claims. Dr. Bruce Norback, a neurologist who began treating Morlock in January 1997, testified that

Morlock had been given a 10 percent workers' compensation disability rating in 1957. This rating was for back injuries incurred when Morlock fell off a loading dock and landed 4 to 5 feet below across a 2 × 6 brace, injuring his right lumbar area. Norback testified that this 10 percent disability was permanent and that it had not gone away and that Morlock continues to be treated for the low back injury he suffered in 1957. He went on to testify that the injuries from the 1957 fall, specifically pain in his right lumbar area and radiation into the right thigh and calf, involved the same sort of pain he was complaining about after the 1996 accident. Norback acknowledged that Morlock had been hospitalized several times for problems associated with the 1957 injury prior to the 1996 accident and that these preaccident complaints about low back pain and pain going down into Morlock's right leg were identical to Morlock's complaints made after the accident. However, when Norback was asked directly if the 1957 injury had anything to do with the postaccident symptoms and pain Morlock had described to Norback, he replied,

> Well, I don't think it does. * * * [A]ll the way through his [sic] 1970's, 1980's [there] is intermittent back pain that he goes to see physicians for. But really after 1991 there is this hiatus of nothing, no bad flare-ups of back pain, no hospitalizations, nothing else. * * * I think the culprit here is still the accident of September 1996 to a reasonable degree of medical certainty.

Norback testified that all of the neck, spine, and back injuries complained about by Morlock at trial were attributable to the September 1996 accident. Specifically, an MRI scan for both Morlock's back and neck revealed a far lateral herniated disk at L2–3 on the right side, possible L2 radiculopathy (disk pinching the nerve), a herniated disk at L3–4 on the right side

and a central protruding or herniated disk obliterating the epidural space at C2–3. While Norback recognized that a neurosurgeon was able to perform surgery on the herniated disks in Morlock's back, he went on to conclude that the injuries to Morlock's neck were not surgically treatable.

Dr. John Rhoades, Morlock's family physician, also testified on appellants' behalf. He indicated that he had no knowledge of Morlock's 1957 accident or any treatment Morlock received as a result of that accident. Rhoades testified that Morlock began attending physical therapy shortly after the 1996 accident but that his condition did not improve. According to Rhoades, as a result of the 1996 accident Morlock was unable to work, had a limited range of motion for his neck, had neck pain, shoulder pain, lower back pain, daily headaches, and was having trouble sleeping. Rhoades further testified that Morlock had some degeneration of his spine over the years and chronic arthritis and as well as various problems with his elbows, shoulder, and knee prior to the 1996 accident. When asked directly whether any of Morlock's current problems were related to any preexisting medical conditions Rhoades responded that they were not, except that if Morlock was having any knee pain, it would be related to his preexisting knee problems.

Respondent presented only one medical witness, Dr. Daniel Ahlberg. He testified that based on his review of Morlock's medical records and his examination of Morlock, he believed that none of Morlock's complaints for future claims after the surgery and recovery period were the result of the car accident. Instead, Ahlberg testified all of these complaints were the result of his degenerative diseases that predated the accident and Morlock's

"functional overlay" of associating his pain with the accident.[1] Ahlberg testified,

> [Morlock's] principal problem is chronic pain syndrome, which basically is the fact that he has a background, degenerative problem with spine disease, primarily in the lower back, also to some degree in his neck, and although that's present, there's substantial exaggeration of his symptomatology. There's no evidence for any neurological deficit. * * * [H]is principal problem is chronic pain substantially exaggerated by dysfunctionality * * *.

He concluded that Morlock's disk herniations were appropriately treated with surgery and that Morlock had fully recovered from these injuries.

Respondent conceded during both its opening statement and its closing argument that Morlock suffered two herniated disks in his low back as a result of the 1996 accident and that surgery was needed to treat these injuries. Respondent pointed out during its closing argument that the reasonable medical expenses for such treatment was $28,000, which the parties had stipulated to before trial. Respondent then pointed out various medical records produced at trial and argued that these showed that Morlock had a history of lower back problems and various ailments associated with his joints, including a degenerative disease in his knee, and arthritis. Respondent's counsel argued to the jury that all of Morlock's ongoing problems or disabilities were a result of these preexisting conditions, including the 1957 accident, stating: "I submit to you that if Mr. Morlock is having ongoing problems and ongoing disabilities, it is as a result of his preexisting problems, his degenerative joints, his ten percent disability, his steadily progressing degeneration of the arthritis in his back." While respondent conceded that Morlock may be entitled to some damages for pain, suffering, disability, and disfigurement between the 1996 accident and his surgery and recovery period, suggesting $25,000, it argued that Morlock should recover nothing for future disability, embarrassment, disfigurement, and emotional distress because all of these claims related to his preexisting conditions and were not in any way a result of the 1996 accident. As for wage loss damages, respondent argued that the jury should only award damages for one year's worth of Morlock's income, which was between $28,000 and $50,000 depending on which witness the jury agreed with. Finally, respondent pointed out that Judy Morlock did not testify and told the jury not to speculate or guess as to her loss of consortium damages, but told the jury that it was up to them to decide her claim based on the testimony of others.

Appellants argued during closing argument that respondent was taking the focus off of the injuries complained of in the case and that he was not seeking damages for any problems he had other than the back and neck injuries that resulted from the

---

1. When asked what "functional overlay" meant Ahlberg responded,

> Well, if a patient has a problem, there may or may not be a variety of impairments as a result of that problem. But if, based on emotional and/or willful exaggeration of that difficulty they—the patient complains of incapacitation or complains of the lack of ability to do things beyond that would be expected, there's what's called functional overlay. There is an overlying problem which is not physiological or anatomical, but which is basically an emotional or willful exaggeration, and there's a whole spectrum that can occur all the way from a conversion hysteria where a patient is totally, consciously unaware that they are reacting that way, to malingering, which is conscious, conniving, conceiving, willful, exaggeration to gain some other benefit, whatever that might be.

1996 accident.[2] Appellants' counsel went on to point out the language of CIVJIG 91.40 and stated that if Morlock had a preexisting back problem, that problem was related to aging of his spine, which was not related to the damages being sought for the accident other than that Morlock's aging spine may have made him more susceptible to injury.

The jury returned a special verdict awarding $508,060.50 in damages to Dean Morlock and $125,000 for loss of consortium to Judy Morlock. Respondent brought a posttrial motion, arguing that the last sentence of CIVJIG 91.40 was an erroneous jury instruction entitling respondent to either judgment notwithstanding the verdict or a new trial and, in the alternative, remittitur was appropriate. This motion was denied in its entirety. Respondent appealed and the court of appeals reversed and remanded for a new trial, concluding that the jury instruction based on CIVJIG 91.40 was a misstatement of Minnesota law and that a new trial was warranted. The court went on to conclude that, because Judy Morlock's loss of consortium claim was inextricably linked to Dean Morlock's claim, a new trial was also warranted for her claim. This appeal followed.

## I.

District courts are allowed considerable latitude in selecting language used in the jury charge and determining the propriety of a specific instruction. *Alholm v. Wilt,* 394 N.W.2d 488, 490 (Minn. 1986). An appellate court should view the instructions as far as possible from the standpoint of the total impact or impression upon the jury. *Lieberman v. Korsh,* 264 Minn. 234, 242, 119 N.W.2d 180, 186

(1962). If the instruction destroys the substantial correctness of the charge as a whole, causes a miscarriage of justice, or results in substantial prejudice, the error requires a new trial. *Lindstrom v. Yellow Taxi Co. of Minneapolis,* 298 Minn. 224, 229, 214 N.W.2d 672, 676 (1974). Therefore, a new trial is required if the jury instruction was erroneous and such error was prejudicial to respondent. *Lewis v. Equitable Life Assur. Soc. of the U.S.,* 389 N.W.2d 876, 885 (Minn.1986). A new trial is also required if the instruction was erroneous and its effect cannot be determined. *Lieberman v. Korsh,* 264 Minn. 234, 242, 119 N.W.2d 180, 186 (1962).

Here, the district court first instructed the jury: "a party asking for damages must prove the nature, extent, duration, and consequences of his or her injury." *See* 4A Minnesota District Judges Association, *Minnesota Practice, Jury Instruction Guides—Civil,* JIG 90.15 (4th ed.1999). Next, the court told the jury that it "must not decide damages based on speculation or guess" and went on to instruct the jury as follows:

> A person who has a defect or disability at the time of an accident is entitled to damages for any aggravation of that pre-existing condition. Damages are limited, however, to results which are over and above those which normally followed from the pre-existing condition, had there been no accident. If you cannot separate damages from those caused by the accident, the defendant is liable for all the damages.

This instruction was a slight variation on CIVJIG 91.40, which states:

> There is evidence that (plaintiff) had a pre-existing disability or medical condi-

---

**2.** Appellants' counsel told the jury: "This case is not about Dean Morlock's toe. It's not about his foot. It's not about either one of his knees. It's not about his shoulder, his hernia or his elbow."

tion at the time of the accident. (Defendant) is liable only for any damages that you find to be directly caused by the accident. If you cannot separate damages caused by the pre-existing disability or medical condition from those caused by the accident, then (defendant) is liable for all of the damages.

4A Minnesota District Judges Association, *Minnesota Practice, Jury Instruction Guides—Civil,* JIG 91.40 (4th ed.1999). The court of appeals, acceding to the discussion in *Blatz v. Allina Health Sys.,* 622 N.W.2d 376 (Minn.App.), *rev. denied* (Minn. May 16, 2001), held that the instruction given in this case misstated Minnesota law. *Morlock v. St. Paul Guardian Ins. Co.,* 632 N.W.2d 268, 272 (Minn.App.2001).

■ According to the parties, the only issue on appeal relates to the last sentence of CIVJIG 91.40 as given. As the court of appeals in *Blatz* noted, CIVJIG 91.40 was intended to take the place of CIVJIG 163, which was part of the third edition of the *Jury Instruction Guides—Civil* and was the instruction respondent requested the district court to give in this case. 622 N.W.2d at 390. CIVJIG 163 read:

A person who has a defect or disability at the time of an accident is nevertheless entitled to damages for any aggravation of such pre-existing condition, even though the particular results would not have followed if the injured person had not been subject to such pre-existing condition. Damages are limited, however, to those results which are over and above those which normally followed from the pre-existing condition, had there been no accident.

4 Minnesota District Judges Association, *Minnesota Practice, Jury Instruction Guides—Civil,* JIG 163 (3d ed.1986). CIVJIG 163 was based on *Nelson v. Twin City Motor Bus Co.,* where we held,

[W]here a pre-existing disease is aggravated by the negligence of another person, the victim's recovery in damages is limited to the additional injury caused by this aggravation over and above the consequences which the pre-existing disease, running its normal course, would itself have caused if there had been no aggravation by negligent injury.

239 Minn. 276, 280, 58 N.W.2d 561, 563 (1953); *see also Schore v. Mueller,* 290 Minn. 186, 190, 186 N.W.2d 699, 701–02 (1971) (following *Nelson* ). Both the first two sentences of CIVJIG 91.40 and the first two sentences of the instruction given in this case are consistent with *Nelson.* Before we can decide whether the third sentence of CIVJIG 91.40 as utilized in this case is an erroneous statement of Minnesota law, we must first consider whether it was appropriate for the district court to give any portion of the CIVJIG 91.40 instruction, including the first two sentences, given the facts of this case and the theories presented by the parties.

We start by recognizing that neither appellants nor respondent argued that there were any aggravation damages; appellants argued that all of the damages they were seeking were solely the result of the 1996 accident and respondent argued that all of the damages being sought for any problems after appellant's surgery and recovery period were solely the result of his preexisting conditions or disabilities. In other words, neither party argued that appellants were entitled to any damages for any aggravation of any preexisting condition. Therefore, there was no basis for the district court to give an aggravation instruction. While respondent requested CIVJIG 163 and appellants responded by requesting CIVJIG 91.40, neither party presented evidence to the jury indicating that any portion of the damages being sought by appellants were attributable to a

preexisting condition or disability being aggravated by the 1996 accident. Instead, appellants' expert witnesses testified that all of the neck and back problems complained about by appellant at trial were attributable to the 1996 accident. Respondent's expert witness testified that all of appellant's complaints after the surgery and recovery period were entirely unrelated to the 1996 accident. Appellants' counsel specifically asked the jury to allocate all alleged damages to the 1996 accident. Respondent specifically asked the jury to allocate all alleged damages after the time of appellant's back surgery and recovery period to appellant's preexisting disabilities or conditions and none to the accident. Under these facts, an aggravation instruction was not warranted and we hold that it was error for the district court to give such an instruction.[3]

The dissent fails to acknowledge the way in which this case was presented to the jury. While it may be possible that CIVJIG 91.40 could be inappropriate in a situation where a plaintiff is seeking both "new" damages and damages for aggravation of an admitted to preexisting condition, we need not decide this issue in this case. Neither party presented a theory of recovery or defense based on a single indivisible injury. Contrary to the dissent's position, the jury in this case was not asked to do its best at distinguishing between any preexisting condition and the "aggravation brought about by the defendant's negligent conduct." A new trial, as the dissent recommends, based on a moot or nondispositive issue would be a waste of the parties' time and judicial resources and a final judicial pronouncement about

CIVJIG 91.40 should wait for another day when a jury instruction based on it amounts to a justiciable controversy with an appropriate factual development.

## II.

■ Having held that it was erroneous for the district court to give its instruction because neither party's theory of the case called for it, we must now determine whether the instruction had any impact on the jury's decision. *See Lewis,* 389 N.W.2d at 885; *Lieberman,* 264 Minn. at 242, 119 N.W.2d at 186. The jury was appropriately instructed that, in order for appellants to recover damages, they needed to prove the nature, extent, duration, and consequences of the injury resulting from the accident. Once proved, the jury was free to allocate any of appellants' alleged damages to Morlock's preexisting conditions or to the 1996 accident, as urged by both parties. It appears that the jury accepted the testimony of appellants' experts and arguments of appellants' counsel rather than the testimony of respondent's expert and arguments of respondent's counsel.

The court of appeals reversed the jury verdict in part because the erroneous instruction may have influenced the jury and because it concluded that it could not determine with certainty whether the instruction did influence the jury. The court of appeals then concluded that because of the erroneous instruction, "it was possible, if not probable" that the jury concluded that respondent was liable for all of Morlock's damages "notwithstanding that not all of those damages were due to the 1996

---

**3.** According to the 2002 pocket part, CIVJIG 91.40 is meant to be "limited to cases where a plaintiff, with a pre-existing disability or medical condition, subsequently suffers injury that aggravated the preexisting disability or condition." 4A Minnesota District Judges Association, *Minnesota Practice, Jury Instruction Guides—Civil,* JIG 91.40 (4th ed. Supp.2002). Neither party argued that Morlock suffered an injury that aggravated a preexisting disability or condition, making CIVJIG 91.40 inappropriate.

accident." Therefore, the court of appeals ordered a new trial.

However, the theories presented by appellants and respondent throughout trial were separate and distinct. The evidence did not overlap. The only evidence presented by respondent was testimony of Dr. Ahlberg, the adverse medical expert retained by respondent. Respondent did not dispute that appellant suffered two herniated disks in his lower back that resulted from the accident and that he needed surgery because of the accident and told the jury to award damages for that. However, after the recovery period from the surgery, both the testimony of Dr. Ahlberg and the arguments of respondent's counsel in closing statements indicated that there was no evidence that there was any need for future medical care. More importantly, respondent's counsel argued that if there were problems, "it is a result of [Morlock's] preexisting problems because surgery was a total success and there should be zero damages for any future loss." Respondents reiterated: "what he is currently experiencing is not a result of the accident."

Contrary to what the dissent states, the only argument made by the appellants' counsel relating to the cause of the accident related to Morlock's age, which was 60 years at the time of the accident. Appellants' counsel simply argued that because of his age, the appellant was more susceptible to serious injuries. Therefore, as in *Blatz*, the effects of the instruction are not only limited by the facts of this case, but by the arguments of counsel. *Id.* 622 N.W.2d at 386. The instruction was not prejudicial to respondent to justify granting a new trial.

The jury was presented with an all or nothing scenario as to damage claims after the surgery and recovery period was over and the jury chose to believe appellants'

evidence. It was an abuse of discretion under these facts to give an aggravation of a preexisting condition instruction because there was no evidence of aggravation of a preexisting condition presented by either of the parties. It was therefore error for the court of appeals to speculate that it was either possible or probable that the jury would have concluded that "[respondent] was liable for all of Morlock's damages, notwithstanding that not all of those damages were due to the 1996 accident." There is simply insufficient evidence in the record to support the court of appeal's reasoning on this issue. Because any error in the district court's jury instruction does not warrant a new trial for Dean Morlock's claim, it also does not warrant a new trial for Judy Morlock's claim.

Reversed and judgment reinstated.

BLATZ, C.J., took no part in the consideration or decision of this case.

MEYER, J., not having been a member of this court at the time of the argument and submission, took no part in the consideration or decision of this case.

ANDERSON, RUSSELL A. (dissenting).

I respectfully dissent. The current pattern jury instruction on pre-existing conditions misstates Minnesota law and amounts to an improper extension of the single indivisible injury rule. Because the jury instruction embraced by plaintiffs' counsel before the jury and given in this single plaintiff/single tortfeasor case permitted the jury to allocate liability for harm that may not have been caused by the tortious conduct, I would affirm the remand for a new trial.

In Minnesota, a person who has a pre-existing condition is entitled to recover damages for an aggravation of that condition, "recovery being limited, however, to

the additional injury over and above the consequences which normally would have followed from the preexisting condition absent defendant's negligence." *Schore v. Mueller,* 290 Minn. 186, 189, 186 N.W.2d 699, 701 (1971) (citing *Nelson v. Twin City Motor Bus Co.,* 239 Minn. 276, 280, 58 N.W.2d 561, 563 (1953)). "Put another way, damages for aggravation of a preexisting condition are simply a means to assure that the defendant pays only for the harm he causes, not the harm plaintiff already had." *Leubner v. Sterner,* 493 N.W.2d 119, 122 (Minn.1992) (citing *Schore,* 290 Minn. at 189, 186 N.W.2d at 701, and *Bloomquist v. Minneapolis Furniture Co.,* 112 Minn. 143, 148, 127 N.W. 481, 482 (1910)).

The burden has long been upon the plaintiff to allocate harm caused by the defendant "over and above" the original condition. *Watson v. Rheinderknecht,* 82 Minn. 235, 238, 84 N.W. 798, 799 (1901) (burden was upon the plaintiff "to show in what respect, and to what extent, his present condition could be attributed to the assault and battery, and what could be more properly established as the result of his army experience."). For well over 30 years our pattern jury instruction on items of damage for any aggravation of a preexisting condition has reflected the limita-tion on the measure of damages to the additional injury caused by the aggravation. 4 Minnesota District Judges Association, *Minnesota Practice, Jury Instruction Guides—Civil,* JIG 163 (3d ed.1986).[1] Our rules have been consistent with the Restatement of Torts rules for allocating between harm resulting from a pre-existing condition for which the defendant is in no way responsible and the further harm which his tortious conduct caused. Restatement (Second) of Torts § 433A (1)(b) cmt. e (1965); *see also* Restatement (Third) of Torts: Apportionment of Liability § 26 cmt. f (2000) ("As long as any person caused only a part of damages, * * * the damages are divisible, irrespective of the timing.").

The current pattern jury instruction on pre-existing conditions represents a significant departure from these rules in that it permits an allocation of liability to the defendant for a plaintiff's pre-existing condition if the jury is unable to determine what part of the plaintiff's injuries predated the accident. 4A Minnesota District Judges Association, *Minnesota Practice, Jury Instruction Guides Civil,* JIG 91.40 (4th ed.1999).[2] The commentary to CIVJIG 91.40 suggests its derivation from *Canada by Landy v. McCarthy,* 567

---

1. From 1963 through 1999, CIVJIG 163 covered damages in cases of pre-existing conditions:

   A person who has a defect or disability at the time of an accident is nevertheless entitled to damages for any aggravation of such preexisting condition, even though the particular results would not have followed if the injured person had not been subject to such pre-existing condition. Damages are limited, however, to those results which are over and above those which normally followed from the preexisting condition, had there been no accident.

   4 Minnesota District Judges Association, *Minnesota Practice, Jury Instruction Guides—Civil,* JIG 163 (3d ed.1986).

2. The current pattern jury instruction, CIVJIG 91.40, provides:

   There is evidence that (plaintiff) had a pre-existing disability or medical condition at the time of the accident.

   (Defendant) is liable only for any damages that you find to be directly caused by the accident.

   If you cannot separate damages caused by the pre-existing disability or medical condition from those caused by the accident, then (defendant) is liable for all of the damages.

   4A Minnesota District Judges Association, *Minnesota Practice, Jury Instruction Guides—Civil,* JIG 91.40 (4th ed.1999).

N.W.2d 496 (Minn.1997). *Canada*, however,. involved a unique application of the single indivisible injury rule in which joint and several liability is imposed upon multiple tortfeasors. *Canada*, 567 N.W.2d at 507–08 (citing *Mathews v. Mills*, 288 Minn. 16, 20–21, 178 N.W.2d 841, 844 (1970)).[3]

The single indivisible injury rule can be traced back to *Flaherty v. Northern Pac. Ry. Co.*, 39 Minn. 328, 40 N.W. 160 (1888), and holds that tortfeasors whose separate negligent acts operate together to cause damage to another are each liable for the whole amount of the resulting damage. *Id.* at 329, 40 N.W. at 160–61. A "necessary corollary" to the rule of holding each defendant liable for the entire harm "is that when the harm can be apportioned on some rational basis, then liability should be proportionate only." Gerald W. Boston, *Apportionment of Harm in Tort Law: A Proposed Restatement*, 21 U. Dayton L.Rev. 267, 284 (1996). According to Professor Boston, "by the 1930s, apportionment principles were applied when the plaintiff and the defendant caused similar harm [to plaintiff's property], when the harm was aggravated by acts of nature, and when the defendant aggravated the plaintiff's preexisting harm." *Id.* at 285.

Apportionment principles were eventually incorporated in the Restatement (Second) of Torts §§ 433A, 433B (1965). Section 433A provides for the apportionment of harm to causes:

> (1) Damages for harm are to be apportioned among two or more causes where
>
> > (a) there are distinct harms, or

> (b) there is a reasonable basis for determining the contribution of each cause to a single harm.
>
> (2) Damages for any other harm cannot be apportioned among two or more causes.

Restatement (Second) of Torts § 433A (1965).

Pursuant to section 433A, apportionment principles apply to contributing causes of the harms and divisible harms. Included in the divisible harms are pre-existing conditions. Restatement (Second) of Torts § 433A (1)(b) cmt. e (1965). "In the illustrations of the Restatement (Second), the touchstone of apportionment is reliance on the contribution that causes the ultimate harm and not to some actual division of harm itself." Boston, *supra*, at 301. The single indivisible injury rule holding multiple tortfeasors jointly and severally liable was incorporated in subsection (2). Restatement (Second) of Torts § 433A (2) cmts. h & i (1965). Comment "h" allows joint and several liability in cases of insolvency or death of one of the tortfeasors and comment "i" applies joint and several principles in cases of an "innocent" cause and two or more culpable causes. *Id.*

Section 433B of the Restatement (Second) addresses the burden of proof and failure to produce evidence justifying apportionment. Restatement (Second) of Torts § 433B cmt. g (1965). Section 433B (1) states that the plaintiff must prove that the defendant's tortious conduct caused the harm that is subject to potential apportionment. Section 433B (2) says that it is an exception to the rule stated in subsection (1) and provides for burden-shifting in

---

**3.** *Canada* arose from successive lead-paint poisoning suffered by the minor plaintiff at separate rental properties. The trial court determined that plaintiff's injuries were divisible, a ruling not challenged on appeal, and went on to instruct the jury to apportion among multiple tortfeasors damages between pre-July 1992 lead poisoning and damages occurring after that time. *Canada by Landy v. McCarthy*, 567 N.W.2d 496, 508 n. 7 (Minn. 1997).

two situations involving multiple tortfeasors. When the tortious conduct of two or more defendants has combined to bring about the harm, the defendant seeking to limit liability has the burden as to apportionment; and when the plaintiff sues two or more tortfeasors and proves that at least one of them has caused harm but there is uncertainty as to which one has caused it, the burden is on the defendant to prove that he had not caused the harm. Restatement (Second) of Torts § 433B (2) (1965). Comment "c," in reiterating that subsection (2) is an exception to the general rule that the plaintiff has the burden of establishing that the defendant's tortious conduct caused the harm, suggests that burden-shifting only applies to multiple tortfeasor situations.

The Restatement (Third) of Torts, generally considered a repudiation of joint and several liability,[4] provides for apportionment among two or more persons who caused divisible damages. Restatement (Third) of Torts: Apportionment of Liability § 26 cmt. h (2000). That part of the proposed draft of Restatement (Third) addressing the burden of proof takes no position as to who should bear the burden in apportioning harm between tortious conduct and a pre-existing condition, noting that courts are split on the burden-shifting issue but also recommending that no matter how the burden is allocated, "[s]o long as there is some modicum of evidence that would permit the factfinder to make a causal apportionment, that course is preferable to making whichever party bears the burden of proof to bear the entirety of the loss." Restatement (Third) of Torts: Liability for Physical Harm § 28 cmt. d (Tentative Draft No. 2, 2002).

In contending that a defendant should be liable for the entire amount of damage unless it meets its burden of proof as to apportionment, Morlock relies on the *Newbury* line of cases from other jurisdictions, citing policies having their origin in the single indivisible injury rule.[5] It seems to me, however, that the pre-existing condition situation warrants different treatment than that involving multiple tortfeasors. Generally, the burden of proof is placed on the party with the greatest access to the relevant evidence. With multiple tortfeasors, "they presumably can furnish evidence as to their degree of contribution to the plaintiff's injury. But, if the plaintiff is suffering from a preexisting injury, he or she is in the best position to furnish information on the degree to which that injury was aggravated by the defendant's act." *LaMoureaux v. Totem Ocean Trailer Express, Inc.,* 632 P.2d 539, 545 (Alaska 1981).

---

4. *See* Mark M. Hager, *What's (Not!) in a Restatement? ALI Issue–Dodging on Liability Apportionment,* 33 Conn. L.Rev. 77, 94 (2000); Frank J. Vandall, *A Critique of the Restatement (Third), Apportionment as it Affects Joint and Several Liability,* 49 Emory Law J. 565, 614–15 (2000).

5. *See, e.g., Newbury v. Vogel,* 151 Colo. 520, 379 P.2d 811, 813 (1963) ("plaintiff was entitled to an instruction advising the jury that if they could not apportion the disability between the preexisting arthritis and the trauma then the defendant was liable for the entire damage resulting from the disability"); *Lovely v. Allstate Ins. Co.,* 658 A.2d 1091, 1092 (Me. 1995) (applying *Newbury* single injury rule);

*Tingey v. Christensen,* 987 P.2d 588, 592 (Utah 1999) (recognizing *Newbury* rule). It should be remembered that the *Newbury* rule predated the comparative negligence scheme which was aimed at dealing with the unfairness of the all-or-nothing rule of contributory negligence. Professor Boston believes that the "same all-or-nothing unfairness that compelled the abandonment of the bar of contributory negligence should equally compel the abandonment of a rule of indivisible harm or indivisible causation." Gerald W. Boston, *Apportionment of Harm in Tort Law: A Proposed Restatement,* 21 U. Dayton L.Rev. 267, 372 (1996).

When a pre-existing condition is a "competitor for causal significance," juries are instructed "to do the best they can to make the distinction" between the pre-existing condition and the " 'aggravation' brought about by the defendant's negligent conduct." David W. Robertson, *The Common Sense of Cause in Fact*, 75 Texas L.Rev. 1765, 1795 (1997) (citing *LaMoureaux*, 632 P.2d at 544; *Epps v. City of Baton Rouge*, 604 So.2d 1336, 1345 (La.Ct. App.1992)). "The plaintiff is 'relieve[d] of proving with great exactitude the amount of aggravation,' but ultimately should recover only for the aggravation and not for the effects of the preexisting condition." Robertson, *supra*, at 1795 (quoting *LaMoureaux*, 632 P.2d at 544).

The issue of prior accidents, injuries, and conditions is not, as the Morlocks suggest, an affirmative defense for which the defendant bears the burden of proof; it is simply a defense to allegations of liability. Generally, an affirmative defense is new matter outside the complaint which constitutes a defense; or new matter which, assuming the complaint to be true, is a defense to it. 2 Douglas D. McFarland & William J. Keppel, *Minnesota Civil Practice* § 1151 (3d ed.1999). Morlock asserted that the accident caused his injuries. St. Paul Guardian disputed the extent of its liability for Morlock's injuries. St. Paul Guardian's general denial of liability did not constitute an affirmative defense. Under well-established law, it thus remained Morlock's burden to prove that the accident caused his claimed damages. The pre-existing condition instruction given to the jury, however, alleviated Morlock of this burden. As the court of appeals concluded, the instruction given in this case misstated Minnesota law and improperly extended principles underlying joint and several liability. *Morlock v. St. Paul Guardian Ins. Co.*, 632 N.W.2d 268, 271 (Minn.App.2001) (citing *Blatz v. Allina*

*Health Sys.*, 622 N.W.2d 376, 390 (Minn. App.), *rev. denied* (Minn. May 16, 2001)).

The Morlocks assert that even if the instruction was erroneous, St. Paul Guardian is nevertheless not entitled to a new trial given the manner of litigation. St. Paul Guardian conceded liability for the herniated discs that required surgery but disputed the remaining amount of damages caused by the accident. At trial, relevant evidence included Morlock's medical records documenting Morlock's history of low back trouble dating back to 1957 as well as the opinion of St. Paul Guardian's expert that Morlock's post-automobile accident back complaints were due to pre-existing conditions and the opinions of Morlock's physicians to the effect that Morlock's preexisting conditions had little to do with his post-accident problems.

This was not, as the majority posits, an "all-or-nothing scenario as to damage claims." In arguments related to the propriety of certain jury instructions, counsel for the Morlocks acknowledged that evidence adduced at trial could permit the inference that Morlock's preexisting condition contributed to the harm for which damages were sought; and in his closing remarks to the jury, counsel told the jury that CIVJIG 91.40 was a "very, very important instruction," read the instruction to the jury and then told the jury that if it could not separate damages caused by the preexisting condition from those caused by the accident, St. Paul Guardian was "responsible for all the damages. That's the law." As the trial court noted during post-trial motions, had the burden in apportioning harm not been shifted to St. Paul Guardian, "there may very well be a different result." Inasmuch as there was evidence permitting the factfinder to make a causal apportionment, it was "entirely possible if not probable that the jury used the district court's erroneous instruction to

conclude that Guardian was liable for all of Morlock's damages, notwithstanding that not all of those damages were due to the 1996 accident." *Morlock*, 632 N.W.2d at 272.

I would affirm.

STRINGER, Justice (dissenting).

I join in the dissent of Justice Russell A. Anderson.